[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This action was commenced by the plaintiff Chemart Company (hereinafter referred to as "Chemart") against Alan E. Nixon (hereinafter referred to as "Nixon"), a former employee of Chemart and the current employee of the Photofabrication Engineering, Inc. (hereinafter referred to as "PEI").
Chemart is seeking injunctive relief to restrain and enjoin the defendant from contacting, soliciting, inducing and/or receiving any business from the plaintiff's regular customers. The plaintiff further seeks compensatory damages for lost business and profits as a result of defendants' acts, actions and conduct in contacting, soliciting, inducing and receiving business from plaintiff's regular customers together with punitive damages, interest costs and attorney's fees.
On August 16, 1991, a Temporary Restraining Order was issued consistent with the above described requested relief. The matter was assigned for hearing on August 26, 1991. On that date a motion to dissolve the Temporary Restraining Order was granted. The case was then assigned to Associate Justice Caldarone, who commenced a hearing relative to the request for a Preliminary Injunction.
The undisputed facts in the case are as follows:
1. Chemart is a corporation duly organized and existing under the laws of the State of Rhode Island and is engaged in the business of designing and manufacturing precision and decorative etched parts and ornaments.
2. Defendant PEI is a corporation organized and existing under the laws of the State of Massachusetts, having its principle office in Milford, Massachusetts. PEI is and has been a competitor of Chemart and engages in the same or similar business activity.
3. Nixon, who resides in Pawtucket, Rhode Island, is presently an employee of PEI in the capacity of its National Decorative Sales Manager. He commenced his employment with PEI on or about July 26, 1991. Prior to his employment with PEI he had been an employee of Chemart. He was hired by Chemart in the spring of 1987 in the capacity of a customer service representative. After one year Nixon was promoted to an in-house salesman. After two years in this position he was again promoted on January 20, 1990 to the position of Chemart's sales manager. On March 31, 1991 Chemart terminated his employment with the company.
4. In the course of Nixon's employment with Chemart, Nixon necessarily had access to all of Chemart's customer lists, monthly customer activity reports, records relative to products, pricing, customer orders and purchases and similar sales and marketing records. The confidentiality of these records were specifically discussed with Nixon by Richard E. Beaupre, president of Chemart (hereinafter referred to as "Beaupre"). Nixon acknowledged the highly sensitive nature of this information and clearly understood Chemart's policy to maintain the policy of keeping these records in a state of confidentiality.
5. Shortly after Nixon began his employment with PEI, he sent a letter on company stationery to Whitmor Designs attempting to solicit them as a customer for PEI. (Plaintiff's exhibit #4). Whitmor is and has been a customer of Chemart. Also in early August, 1991 a similar letter was sent to Charleston Mint, a current customer of Chemart. Nixon sent many other letters to companies known to him as customers of Chemart, including Paralyzed Veterans Association of America (PVA); Hand and Hammer; Black East Awards; and Winterland Productions. These letters were accompanied by: 1.) a one page description of PEI; 2.) a one page sales brochure; and 3.) Nixon's business card identifying him as PEI's "National Decorative Sales Manager". While Nixon drafted them, William M. Lehrer, president of PEI (hereinafter referred to as "Lehrer") reviewed and approved their content. A significant amount of the text of PEI's brochure is identical to portions of the text of Chemart's brochure. (See defendant exhibits E, F, G and plaintiff's exhibit 1.)
6. The method by which Chemart and PEI identifies prospective customers is as follows:
a.) Through advertisements in trade journals,
b.) Through attendance at trade shows,
c.) Through unsolicited inquiries,
d.) Use of yellow pages,
e.) Use of Thomas register and various state publication that identify potential users of the product,
f.) Cold calling upon prospective customers.
7. PEI was founded in 1967 some nine years before Chemart was founded and they have competed with each other from the time Chemart became incorporated.
8. At no time during the employment of Nixon by Chemart was Nixon bound to Chemart by any agreement or covenant not to compete with Chemart.
9. Competition between photo-etching vendors such as PEI and Chemart is intense and there is no guarantee or assurance of repeat business from customers but it is more likely than not that with the new business the customer will seek out quotes from other vendors. As a result of the nature of this interaction within the industry, PEI and Chemart share many of the same customers, and on occasion share information to service their common customers.
10. Nixon took no records nor any copies of any records of Chemart customers' lists, monthly customer activity reports, records relating to products, pricing, customers' order or purchases when he left the employment of Chemart on March 21, 1991.
11. Nixon returned to Chemart subsequent to March 21, 1991 for the purpose of requesting that Chemart consider rehiring him in some capacity. This request was met by a refusal on the part of Chemart.
Chemart alleges that as a result of the use of Chemart's confidential and proprietary information regarding the identities of Chemart customers Chemart has already lost at least one account, namely Paralyzed Veterans Association; however, this is disputed by PEI.
Further, Chemart argues that it is entitled to the issuance of the Preliminary Injunction in that it has satisfied by way of proof the four established criteria.
1.) That there is a substantial likelihood that it will succeed on the merits;
2.) That it will suffer irreparable harm in the absence of the requested injunctive relief;
3.) That the harm to the party seeking the injunction in the absence of that relief exceeds the harm to the party against which the relief is sought should that relief be granted; and
4.) That the issuance of the injunctive relief preserving the status quo will not adversely affect public interest.
Leone v. Town of New Shoreham, 534 A.2d 871, 873 (R.I. 1987).
The principal thrust of Chemart's case on the merits rests upon the theory that the identities of Chemart customers are not readily ascertainable and are therefore confidential; proprietary information, the unauthorized use of which by Nixon and PEI constitutes unfair business solicitation and competition which should be enjoined by the court.
Chemart's request for relief will result in preventing a dismissed employee from engaging in work in the occupation in which the dismissed employee has sufficient experience and skill to earn a livelihood. It is agreed that the accepted principles of law are designed to protect former employers against unlawful, unfair disclosure of highly confidential information to competing entities, but this court must determine whether the facts in the instant case warrant the application of the extraordinary relief sought by Chemart.
The issue the court must decide is whether Chemart has a legally protectable interest in the form of its customer list to justify the request for a preliminary injunction. Chemart relies strongly upon the principles enunciated in the two Rhode Island Supreme Court decisions: Colonial Laundries, Inc. v. John J.Henry et al, 48 R.I. 332 (1927) and Go Van v. Piggy BackShippers, Inc., 111 R.I. 697 (1973).
In the Colonial Laundries case the court held when aselected list of customers have been built up by labor and expense on the part of the employer and is secretly imparted to an employee for a specific purpose, it is not of the employee's general knowledge which may be freely used anywhere. That case further stated the equity does not interfere with the employee's right to do business with these customers but it forbids initiation of the business by the use of information given to the employee in confidence by or through the business.
The facts in that case involved the defendants who were drivers of a laundry wagon. The employees, upon entering employment of the plaintiff, Colonial Laundries, were given the names of certain regular customers upon whom to make periodical calls for solicitation and collection of laundry to be done by the plaintiff. The skill, training and experience of the drivers required only that he follow the instructions of the employer in calling upon the list of already established customers that had been developed over the years by the employer. This list of customers constituted what is called a route, and the number of customers on the route increased during defendants' employment. After several years the defendants voluntarily terminated their employment with the plaintiff and during the last week of their employment they notified plaintiff's customers that the defendants were about to go into the laundry business themselves and received assurance that the customers would be willing to give them their laundry business. In the following week they called upon and received eighty percent of the customers of their respective routes, which they took to their new business. The defendants did not copy the list of customers but simply carried the names and addresses of said customers in their memories.
The Superior Court in that case stated that it hitherto had refused to enjoin such conduct but acknowledged the need to consider equitable relief under such circumstances as the Colonial Laundry case presented to the court.
The lower court stated that the defendants under such circumstances should not be allowed to take advantage of the knowledge they had gained in a confidential relationship and granted the injunction.
Again in that case the Supreme Court stated that "an employee lawfully entering upon a competing business may be enjoined from the use of trade secrets or processes, knowledge of the former employer's business surreptitiously obtained or copied lists of customers or information about them."
The various cases concerning lists of customers are not in accord but careful examination discloses the difference among the decisions is not so much one of principle as whether in a given case the list was confidential and if so whether the fact should be ignored in the interest of free competition.
Further the court made reference to Nims on Unfair Competition (2nd ed. Section 151. On page 318 Nims says that a former employee is not entitled to avail himself of his acquaintances with the customers to canvass their trade for a new employee; however, the rule should be applied with caution.
Much depends on the specific facts of the case.
In the Colonial Laundries case the court held that when a selective list has been built up by labor and expenses on the part of the employer and is secretly imparted to a specific employee for a specific purpose it is not a part of the employee's general knowledge which may be used freely anywhere. It is as confidential as would be a formula showing how to mix certain ingredients to produce an article or commerce made only by the employer.
Knowledge of the list in the Colonial Laundries case enabled the drivers to ingratiate themselves with a specificgroup of people gathered in a single unit by the employer. The knowledge came to the defendant only from the plaintiff and for its purpose. With this information the drivers possessed a distinct advantage not in general competition with all laundries but for the purpose of specific injurious competition with the plaintiff. Knowledge of the route enabled the defendant to compete not only by the offer of equal or superior services and on equal terms but to take advantage of the money and labor spent by the plaintiff to group selected people on a particular
route.
The court went on to say that it considers the desirability of encouraging individual business enterprise and initiative. That which by experience has become a part of man's general knowledge cannot or ought not to be interfered with, but when a course of conduct is adopted which at best is "not handsome" and "shocks one's sense of fair play" we see no good reason to allow secret information conveyed for a special purpose to be converted into a weapon of attack on the employer only. "This is neither fair nor general competition."
The court went on to distinguish the function of a traveling salesman selling to the trade; thus, customers are sought from any number of persons who are engaged in certain lines of business and whose identity may be quickly known to any one who cares to examine a directory or trade index; however, in the case of a laundry route a list of customers cannot be obtained; a definite selective group has been gathered together by the employer; not of persons who may deal with him but who if not specifically selected by others will almost certainly continue
to do business with the plaintiff.
In the instant case, the customer each time it makes contact with Chemart desires to examine, inspect and compare merchandise and prices offered to him. Each sale is a distinct transaction carrying no implication that another will follow. (See Lehrer's testimony tr. 148-9).
The list of people Chemart calls upon has no market value apart from a general good opinion of the company's methods, goods and prices. This trade custom is clearly distinguished from a laundry route which has a definite market and sale value. There is a business relationship between the customer and the laundry which unless interfered with normally will continue. Again in theColonial Laundries case the court emphasized the misuse of special confidential knowledge secured while the contractual relationship existed. Nixon was not engaged in any such conduct while employed by Chemart and in fact attempted to regain his job after he was involuntarily terminated. It was only after he was refused this request that he sought employment of a similar nature in order to acquire a livelihood.
The analysis of the facts of the Colonial Laundries case and the instant case permit this court to clearly distinguish the nature of the confidential subject matter and the conduct of the respective party litigants of the two cases. The law enunciated in the Colonial Laundries case clearly fails to assist Chemart in its effort to convince the court that it has a substantial likelihood for success on the merits.
The petitioner cites the Go-Van v. Piggy Back Shippers,Inc., 111 R.I. 697 (1973) as additional authority in support of its contention that there is a substantial likelihood that it will succeed on the merits.
In that case the Supreme Court held that cases involving an employer's effort to insulate his customers from the entreaties of a former employee present the court with the delicate task of balancing the employee's right to compete and earn a living against the "employer's" right to be protected from unfair competition.
As in the instant case the plaintiff Go-Van made no effort to protect its customer list by entering into a contractual agreement, whereby a former employee would not solicit its customers once he left Go-Van's employ. Having failed to contractually protect itself Go-Van had the burden of persuading the court that the identity of its customer was not readily ascertainable through ordinary business channels or through business or trade directories.
In that case the court went on to say the information which is the subject of the controversy would be known by anyone working for a living in the freight solicitation business, a business in which the former employee of Go-Van is well experienced and free to work.
The nature of the business of Go-Van involved the long haul movement by rail or loaded truck on specially fitted flat cars to a point nearest to where the freight is to be delivered. The defendant worked for Go-Van for several years until he left and started his own corporation. In seeking business he contacted 26 of Go-Van's customers and convinced six of them to ship their goods through his corporation.
The court, in contrast to the Colonial Laundries case, failed to consider Go-Van's list of customers as something akin to a trade secret.
The court referred to the Callahan v. Rhode Island Oil Co.,103 R.I. 656, 240 A.2d 411 (1968) and distinguished the facts in that case from the Colonial Laundries case. In the Callahan
case the court determined that the former employee solicitation of Callahan customers could otherwise be easily identified by the simple expedient of looking at the advertising material on display in the various stations or by simply perusing the yellow pages of any telephone book.
The court in the Go-Van case stated further that althoughGo-Van customers represented a wide array of industries the fact that they use the facilities offered by interstate carriers is readily ascertainable and a matter of common knowledge within the business community.
This court finds the factual pattern of the Go-Van andCallahan cases most analogous to the facts in the instant case and therefor finds that the legal principles enunciated in theGo-Van or Callahan cases are justifiably applicable to the resolving of the issues in the instant case.
Chemart argues that the identities of this customer list are not readily ascertainable and therefore those identities are confidential. It further argues that this proprietary information and the unauthorized use of the information by Nixon and PEI constitutes unfair business solicitation which the court should enjoin.
The evidence does not support this contention. The chief executive officers of both the Chemart and PEI Corporation testified at length as to the methods employed to acquire customers for their services. There was little or no difference with respect to the method used for the acquisition of customers for their trade and business. The source of referrals of potential customers is commonly known and in some instances shared by members of industry. There is nothing secretive, confidential or unique about the needs of potential customers. As a matter of fact both Chemart and PEI are often solicited to submit bids to common potential customers.
It is certainly in Chemart's best interest that a customers' list not be made available to competitors and that any current employee who shares that list in the course of the performance of his duties be made aware of the value of the list.
There is no doubt that Nixon engaged in some effort to utilize the identity of customers of Chemart for the purpose of soliciting business for his new employer, PEI. This effort may well have constituted a scheme or plan to acquire new business for PEI. However, the use of such information in the manner described falls short of a breach of duty to misuse confidential information to the extent that injunctive relief should be considered.
In reviewing the principles enunciated in the case law submitted by the plaintiff the court cannot find a basis upon which injunctive relief can be granted. The customer list of Chemart is more akin with the described customer lists in theCallahan and Go-Van cases. The Colonial Laundries case is clearly distinguishable. The legal principles established by these cases clearly precludes consideration for the granting of any injunctive relief to Chemart in this case. Consequently, the court finds no likelihood of success for Chemart's complaint.
Based upon the court's finding as it relates to the likelihood of the success of Chemart's claims, the court need not explore the remaining requirements for the relief sought by Chemart, but the court will offer some response to the contentions of Chemart with respect to the remaining issues of the case.
Chemart argues that in the event it does not acquire the relief sought it will suffer irreparable harm.
The court finds great difficulty in determining what harm, if any, Chemart has suffered as a direct result of Nixon contacting some of the customers of Chemart. As PEI points out in its memorandum (page 22) the testimony clearly showed that none of the so-called "Chemart Customers" approached by Mr. Nixon have transacted any business with PEI with one exception. This one exception is Paralyzed Veterans of America (PVA), which cannot be considered a loss to Chemart resulting from any contact initiated by Nixon or PEI, because it is clear that a third photo-etching company, Micro Etch, received a substantial portion of the PVA business as well.
It is also clear that money damages can be readily ascertained if Chemart should succeed on the merits subsequent to a hearing on the Permanent Injunction. The loss of any business from the current list of customers of Chemart by the solicitation of PEI and Nixon can be readily ascertained and liquidated damages awarded accordingly.
In balancing the harm that will inure to either party if the sought after injunctive relief is granted, the court has no difficulty determining that such injunctive relief would cause insurmountable difficulty and economic hardship for PEI. The evidence is replete with the knowledge that Chemart and PEI engage in similar efforts to acquire business from a common marketplace. There is a sharing of business with the same customers.
PEI does not have a complete list of Chemart's customers and therefore it would be impossible to comply with such an order without totally abandoning that business. As Lehrer stated, the loss of the decorative business of PEI would render the company bankrupt and force it out of business. No comparable testimony was elicited at the hearing which would alter the balance of the equities in favor of Chemart.
In viewing the impact upon the public interest if such injunctive relief is granted, the court finds that PIE, its employees and Nixon will suffer greatly as a result of the requested injunctive relief. The enforcement of the requested preliminary injunction, especially during the current national economic recession, necessitating the termination of sales executives and the accompanying effort to gain new employment would place great restrictions on the hiring practices of competing companies and further exacerbate an already distressed economic climate.
In conclusion, Chemart has not met either its legal or evidentiary burden in its effort to gain the injunctive relief sought. Accordingly, the Preliminary Injunctive Relief sought by Chemart is denied.